438 So.2d 336 (1982)
David Leroy COULTER
v.
STATE.
8 Div. 673.
Court of Criminal Appeals of Alabama.
December 28, 1982.
Rehearing Denied February 1, 1983.
*338 Carl Stolsworth and William J. Underwood, Tuscumbia, for appellant.
Charles A. Graddick, Atty. Gen., and Ed Carnes, Asst. Atty. Gen., for appellee.
BARRON, Judge.
David Leroy Coulter, the appellant, was convicted under § 13-11-2(a)(2), Code of Alabama 1975, for the robbery and the intentional killing of George Morris in rural Colbert County. A separate sentencing hearing was held before the same jury that had found the appellant guilty of the capital offense. The jury weighed the evidence of aggravating and mitigating circumstances and fixed appellant's punishment at death. In a second sentencing hearing, the trial court independently weighed the aggravating and mitigating circumstances pursuant to §§ 13-11-3 and -4, Code of Alabama, 1975, and, in accordance with the jury's punishment determination, sentenced the appellant to death. The trial court in its "Order of Court on Imposition of Death Penalty" (attached as Exhibit A) specified its findings of fact from the guilt phase and sentencing phase hearings, including a description of the aggravating and mitigating circumstances which it had considered.
On September 26, 1977, the appellant and two companions, Tony Almedeo and Bill Conologue, left Jacksonville, North Carolina, on their way to Memphis, Tennessee, to visit Almedeo's girlfriend. During the three days that followed, the three men went on a crime spree that included the incident in Alabama on September 28, wherein George Morris was robbed and killed (the appellant and Conologue were *339 arrested in McDuffy County, Georgia, on September 29).

Guilt Phase Hearing
In an interview with Alabama officials the morning after his arrest in Georgia, the appellant made a detailed voluntary statement describing the robbery and killing of George Morris in Colbert County, Alabama. His statement was transcribed independently by both Lawrence Smelley, an investigator with the Alabama Bureau of Investigation, and Ronnie May, an investigator with the Colbert County Sheriff's Department. Their transcriptions of appellant's statement were admitted by the trial court and read into evidence by each official. The recordings were essentially identical. In the words of Lawrence Smelley, the appellant's statement read as follows:
"Tony Almedeo, Bill Conologue and myself left Jacksonville, North Carolina in Tony's white Chevrolet Monte Carlo. We went to Memphis, Tennessee to see Tony's girlfriend. We pulled into Memphis around 10:00 A.M. on Tuesday the 27th and we left Memphis around 9:00 P.M. That night headed back to Jacksonville. We spent Tuesday night in the car on the side of the highway, Highway Number 125 in Tennessee. The day we left Jacksonville Tony borrowed a .22 caliber automatic from a black dude and he had intended to get even with a white guy in Memphis who had stolen his black chic. I bought three boxes of .22 short ammo at Gibson's in Jacksonville, North Carolina. Tony had planned on robbing some places during the trip to get the money we needed. On Wednesday we woke up on the side of the road Number 125 in Tennessee and we drove on down until we came to U.S. Highway 72 and we turned east onto it and went into Alabama. Not long after we got into Alabama we stopped at a fairly new country store and Bill who was driving went in and tried to cash a check for ten dollars on a North Carolina bank. The lady wouldn't cash it and told us to go to the bank. So we went to the bank in this small town and Bill went in the bank and tried to cash the check but they wouldn't cash it either. Bill got back in the car and we headed on east on U.S. 72 until we came to this deserted looking country store and gas station. It was just a few miles from where we had tried to cash the check at the bank. I suggested that we rob the store so Bill pulled in. It was about 10:00 A.M. in the morning when we pulled in the store lot. The place had two gas pumps and we pulled up on the outside of the pumps. Right across the drive from the store was a brown brick house and the drive went right on by the store and by the house and came out on another road that I believe ran into the small town where we tried to cash the check. I went in the store and an old black man wearing suspenders was in back of the store banging on something. I think he was wearing glasses. He asked me how I was doing and if he could help me and I said `I'm just looking around. I'm going back out and see what the hell the other want.' I went outside and got Tony and we went back inside. I bought a orange drink in a bottle and Tony bought a grape drink in a can. We talked with the old man for a minute and when he opened the till to put the money we paid him in we pulled our guns and told him to leave it open and back away. I had the .22 and Tony had the starter pistol. I told the old man to stay away from the back door and he started toward the back door and I grabbed him by the suspenders. He said, `this way.' I led him by the suspender straps through a small passage way to the rear of the store. I put the pistol on safety and hit the old man in the back of the head and he tried to hide under some foam rubber and said `Don't kill me, don't kill me.' And I said `Don't worry about it, just lay down on the floor.' And he said `Go ahead and take it all. Take it all but don't kill me.' At this time I didn't have any intention of killing anybody. While all of this was going on Tony was getting the money out of the till. Tony then walked back to where we were and said `Get his wallet.'

*340 I got his wallet and got two ten dollar bills and a one dollar bill out of it and then I threw it over a pile of stuff in the back of the store. A lot of papers came out of it when I threw it. I then walked up to the man's head and I stomped him in the back of the neck with my heel. At this time I noticed a lawnmower near where the old man was laying. After I stomped the old man in the neck I started to walk out and Tony said `Cap him' and I fired the pistol toward the old man. I don't know at the time, I didn't know at the time that I hit him. I just fired in his direction to satisfy Tony. After I fired I put the pistol in my pocket and when I got back out of the store to the car I took the pistol out and noted the gun was jammed. When I went in the store I had one round in the chamber and four in the clip. And when I got out to the car I had two in the clip and one jammed in the gun. When we left the store I left my drink bottle on the counter and Tony took his can with him. Tony walked hurriedly to the car passing through the gas pumps and I walked at a moderate pace to the car passing through the gas pumps. When I got in the car on the passenger side I told Bill that I had shot the old man. I asked him if he heard it and he said `Yes.' I asked him if it was loud and he said `About like a loud firecracker.' Tony got in the back and we pulled out headed east. Tony counted the money that he got which was $26.00 and he gave it to me. I added it to the $21.00 that I got and divided it out at $15.00 a piece and I put $2.00 in the tray for the kitty to buy cigarettes and stuff with. We then went on down the road and stopped in a small town at a store that had six gas pumps. We bought two packages of ham, some cheese, some bread, two packs of Kool and some Chesterfield's and some milk. There was a teenage girl behind the counter and we asked her where we could buy some beer and she told us Huntsville or Nashville or Warrior was the closest places. We then went on down to Birmingham. On the way to Memphis on Tuesday morning we robbed a place near Michigan City on Highway 72 in Mississippi. It had one gas pump and it was also a store. We got $52.00 off of it."
This statement was fully corroborated through the testimony of other witnesses.
Helen Morris, the wife of the victim, stated that her husband left the house at approximately 9 a.m., as he usually did, and walked across the yard to begin work at their store.
When Mrs. Morris went to relieve him for breakfast at 10 a.m., she found him lying face down in a pool of blood back in the side room of the store. She did not realize at the time what had happened. She had seen an opened bottle of orange soda on the front counter, but had seen no other evidence that anyone else had been in the store. She did not realize her husband had been shot until she reached the hospital and learned that the gunshot wound had been fatal.
John Kilbourn, the toxicologist who performed the autopsy, reported that the cause of death was a gunshot wound to the left rear portion of the deceased's head. He suspected that the gun that fired the fatal shot was held more than two feet from the deceased when fired because there were no powder burns or residue on the body. Kilbourn removed a .22 caliber slug from where it had lodged in the front left portion of the deceased's brain. He had also found an empty .22 caliber casing and a "live" round of .22 caliber ammunition at the scene of the crime. Kilbourn's autopsy also revealed facial abrasions to the nose and inner surface of the lips, and a laceration of the kidney and a hemorrhage of the intestines. He explained that the latter two internal injuries were consistent with a "hard kick" to the lower back of the deceased. The facial lacerations were depicted in a photograph admitted into evidence. Kilbourn also lifted fingerprints from a cash register receipt found on the front counter of the store. He explained that these prints were later identified as belonging to Tony Almedeo.
*341 Ronnie May, in addition to reading his transcription of appellant's statement taken in Georgia the day after his arrest, testified that he arrived at Morris's store between thirty-eight minutes and an hour after Mrs. Morris discovered her husband's body. As soon as the body was removed, the store was "sealed off" for investigation purposes. Using photographs and diagrams, May described the scene as he and the other Colbert County officials found it shortly after the killing. One photograph showed the bottle of orange soda on the front counter, and another showed the partitioned-off side room where the deceased was found face down in a pool of blood. A sketch of the scene demonstrated that the location of the deceased was consistent with the appellant's statement describing where he had left the victim. The sketch further showed that the spent .22 caliber hull and the "live" round of .22 caliber ammunition, mentioned by Witness Kilbourn, were found three feet one inch and two feet four and one-half inches, respectively, from the center of the pool of blood. Witness May further testified that he first learned of the bottle of orange soda and the cash register receipt when he was interviewing the appellant in Georgia, and that he, subsequently, found both on the front counter of Morris's store, where the appellant and Almedeo had left them.
An investigator for the Georgia Bureau of Investigation testified that he stopped the appellant and Conologue in a white Monte Carlo on September 29, and arrested them for leaving a gas station without paying for gasoline. Another G.B.I. investigator subsequently found a .22 caliber automatic pistol under the seat of the Monte Carlo where the appellant had been sitting. This weapon was delivered to Kelley Fite of the Georgia State Crime Laboratory for analysis.
Fite testified that the test firing of this weapon revealed that when a round of ammunition was fired, the pistol would occasionally eject not only the spent casing from the round fired but also the following "live" round. A second "live" round would then jam in the weapon and prevent a second shot from being fired. The weapon had been found in this jammed position. Fite also testified that he sent spent casings fired from this .22 caliber pistol to Mr. Kilbourn at the Alabama Criminal Laboratory in Florence for comparison with the spent casing found at the scene.
Mr. Kilbourn compared the spent casings and concluded that they were fired from the same .22 caliber automatic pistol.
The appellant did not testify. His only witness during the guilt phase of the trial was W.B. Mosley. Mosley testified that when Mrs. Morris summoned him to her husband's side, Mr. Morris was still alive, but motionless. His right cheek was resting on the floor. Mosley stated that he moved a lawn mower to get to the body, and he was certain that boxes and other items were pushed out of the way when the rescue squad picked up the body.
Appellant admitted that he robbed and shot Mr. Morris. His theory in defense of the capital felony charge was that he did not "intentionally" kill Mr. Morris. He apparently based this theory on his contention in his statements, read into evidence by prosecution witnesses, that it was Almedeo's idea to shoot Mr. Morris and that he shot only to appease Almedeo. His statements also implied that, when he fired the fatal shot, he was a good distance from Mr. Morris and, without taking aim, merely fired in his general direction. His distance from Mr. Morris was impossible to determine, but the absence of powder burns on the body did indicate that the weapon was fired from a distance of more than two feet. The State introduced the location of the spent casing and the "live" round of ammunition to show that the appellant was close to Mr. Morris when he fired the fatal shot to the back of Morris's head. Mosley's testimony was introduced by the appellant to show that the casing and the "live" round might have been moved before they were discovered.
In any event, the State's evidence was sufficient to present the question of appellant's guilt to the jury, and the jury returned *342 a verdict of "guilty of the capital offense as charged in the indictment."

Sentencing Phase Hearing
In the subsequent sentencing hearing before the same jury, the State, summarily, resubmitted "all the evidence that was brought forward at the guilt phase of this trial," the appellant renewed his objections to same, and the trial court renewed its rulings thereto. The only additional evidence introduced by the State was the prior recorded testimony of the appellant at a previous sentencing hearing[1] wherein the appellant admitted, under oath, that he had previously been convicted of murder and criminal assault in Georgia. These Georgia convictions were for appellant's involvement in incidents which were part of his and his companions' three-day crime spree and which occurred the day after he shot Mr. Morris. They were introduced by the State as evidence of the aggravating circumstance enumerated in § 13-11-6(2), Code of Alabama 1975, that "[t]he defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person."
Pursuant to discussions between the trial court and counsel outside the hearing of the jury, the only other aggravating circumstance claimed by the State was that "[t]he capital felony was especially heinous, atrocious or cruel" (§ 13-11-6(8), Code of Alabama 1975).
The appellant presented evidence of his good character before and after the three-day crime spree which included the capital murder of Mr. Morris. He presented a petition signed by sixty of his friends and relatives who knew him in his hometown of Hastings, Minnesota, wherein each attested to the appellant's good character and his history of good behavior before these incidents.
Dorothy Wilson testified that she had met the appellant subsequent to his incarceration for the instant offense, and that after reading the Bible with him, she was convinced that he was a good person and could help other prisoners if allowed to live. Paul Otterback also testified that he had visited the appellant in jail, and that the appellant was a good person and had become very active in prison religious services. There was also evidence that the appellant had successfully completed a Bible study correspondence course while incarcerated.
After the trial court had adequately instructed the jury with reference to the two alleged aggravating circumstances and all of the possible mitigating circumstances, including the appellant's age and any aspect of his character and record or any circumstance of this particular offense, the jury returned a verdict fixing appellant's punishment at death.

Trial Court Sentencing Hearing
The trial court held a final sentencing hearing pursuant to §§ 13-11-3 and 4 and detailed its findings in the order attached to this opinion as "Exhibit A."
The trial court found the existence of the aggravating circumstances enumerated in §§ 13-11-6(2) and 6(8) and the mitigating circumstance enumerated in § 13-11-7(7). It further found as mitigating circumstances that the appellant "proved his good character and life prior to the act of killing the deceased George Morris" and had shown remorse for his actions. After weighing the aggravating and mitigating circumstances, the trial court determined that the aggravating circumstances outweighed the mitigating circumstances and it, consequently, sentenced the appellant to death by electrocution.

I
Initially, the appellant challenges the constitutionality of the Alabama Supreme Court's action in Beck v. State, 396 So.2d 645 (Ala.1981), of severing the "preclusion clause" (a provision declared unconstitutional by the United States Supreme Court in Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980)) from Alabama's *343 Death Penalty Statute and, thereby, reviving the remainder of the statute. This issue has previously been decided against the appellant in Beck, 396 So.2d 645, itself, and in Clisby v. State, [Ms. 6 Div. 576, March 2, 1982] (Ala.Cr.App.1982), and confirmed in subsequent cases. See Edwards v. State, [Ms. 1 Div. 335, June 29, 1982] (Ala.Cr. App.1982), and cases therein cited; Magwood v. State, 426 So.2d 918 (Ala.Cr.App. 1982); Raines v. State, 429 So.2d 1104 (Ala. Cr.App.1982).

II
In an apparent attempt to corroborate appellant's several written statements wherein he admitted his presence at the scene of the crime and his participation in the events which led to Mr. Morris's death, the State presented a fingerprint comparison report prepared by the Alabama Bureau of Investigation. The report concluded that fingerprints "lifted" from a cash register receipt found on the front counter in Morris's store were the fingerprints of Tony Almedeo, appellant's accomplice. This report and its conclusions were presented through the testimony of John Kilbourn, who had raised the unknown prints from the receipt and had submitted these "lifts" to the A.B.I. lab. The appellant contends that the trial court's action of admitting this report and its conclusions through the testimony of John Kilbourn was reversible error because a proper predicate was never established.
The State concedes that the admissibility of both the report and its conclusions was questionable under the circumstances but submits, and we agree, that any errors committed by the trial court in admitting this evidence were, in this instance, harmless.
As noted above, appellant's presence at the scene of the crime was undisputed. In his written statements, he admitted that he and Almedeo entered Morris's store intending to rob him, that they purchased a grape soda and an orange soda (which the appellant left on the counter), that he, the appellant, led Morris to the partitioned-off room in the store while Almedeo took money from the cash register, that he hit Morris with the gun and made him lie face down on the floor near some tires, that he kicked him, that he fired a shot at Morris, and that his .22 caliber pistol jammed after that shot was fired. As noted above, these statements were fully corroborated by other evidence.
The appellant, at no time before or during the trial, denied that he was present during the robbery-homicide or that he shot Mr. Morris. His sole contention during trial was that he did not intend to kill Mr. Morris, that he shot "in his direction" only to appease his accomplice, Almedeo. The fingerprint information, which merely placed Almedeo at the scene, had little if any corroborating significance. The jury's verdict would have been the same without this evidence. The jury was not called upon to determine whether or not the appellant was present when Mr. Morris was killed, or even whether or not the appellant fired the shot that killed him. The sole question for the jury during the guilt phase of the trial was the appellant's intent, an issue upon which the fingerprint evidence had absolutely no effect.
Errors, if any, in admitting fingerprint evidence to prove the accused's presence at the scene of the crime, are harmless where, as here, the accused's presence is undisputed and uncontradicted. Yelton v. State, 294 Ala. 340, 342, 317 So.2d 331 (1974); Brown v. State, 55 Ala.App. 264, 314 So.2d 717, cert. denied, 294 Ala. 241, 314 So.2d 721 (1975). See also, Rogers v. State, 53 Ala. App. 573, 302 So.2d 547 (1974); Woods v. State, 54 Ala.App. 591, 310 So.2d 891 (1975); Kelley v. State, 366 So.2d 1145 (Ala.Cr.App. 1979); Johnson v. State, 378 So.2d 1164 (Ala.Cr.App.), cert. denied, 378 So.2d 1173 (Ala.1979).

III
Contrary to appellant's assertion, the trial court did not err in admitting a photograph of the victim, which showed a tracheotomy incision in addition to the facial *344 bruises and abrasions inflicted just prior to death, where, as here, the tracheotomy incision was adequately identified for the jury. Gilmore v. State, 346 So.2d 1193 (Ala. Cr.App.1977), and cases cited therein. The probative value of this photograph was an issue within the trial court's sound discretion, which was not abused in this instance. Thornton v. State, 369 So.2d 63 (Ala.Cr. App.1979); Lawrence v. State, 409 So.2d 987 (Ala.Cr.App.1982).

IV
The trial court instructed the jury with reference to the capital offense charged in the indictment and with reference to two lesser included offenses, first-degree murder based on the felony murder doctrine and first-degree murder based on an intentional killing which was willful, deliberate, malicious and premeditated. (See Ala.Code § 13-1-70 (1975).) The appellant requested additional charges on second-degree murder and manslaughter and cites as error the trial court's refusal of these additional charges.
Appellant contends that the trial court erred because second-degree murder and manslaughter were evidenced by his claim that he did not "intend" to kill his victim. This argument fails because an unintentional killing during the course of a robbery is, nevertheless, first-degree murder under the felony murder doctrine, and the evidence was undisputed that appellant killed his victim during the course of robbing him. Had the jury believed appellant's assertion that he did not "intend" to kill Morris, its verdict would have been for first-degree "felony murder," a lesser included offense which was properly explained to the jury.
The lesser included offense charges of second-degree murder and manslaughter were not supported by the evidence and were properly refused by the trial court. Potts v. State, 426 So.2d 886 (Ala.Cr.App. 1982); Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982). (For the same proposition of law in non-capital cases see Fulghum v. State, 291 Ala. 71, 277 So.2d 886 (1973), and cases cited therein.)

V
At the beginning of the sentencing phase of appellant's trial, in a conference outside the hearing of the jury, the trial court stated:
"Well, I would like to put on the record that I have instructed the parties in chambers that they may not go into any matter which concerns any sentence received by any accomplices or co-defendants and in this particular case they cannot go into any sentence received by Conologue.... It is my understanding of the Beck case [Beck v. State, 396 So.2d 645 (Ala.1981)] ... that the defendant is not limited only to the mitigating circumstances listed in Section 13-11-7 of the Code of Alabama 1975, that there may be other mitigating circumstances proved by the defendant, but that the sentence received by a co-defendant, in this case Bill Conologue, is not admissible as mitigating circumstances in this particular case."
The trial court reasoned that Conologue's sentence was not relevant in the sentencing phase of appellant's trial because the appellant would not necessarily be entitled to the same mitigating circumstances that might have been available for Conologue. In answer to appellant's final inquiry as to the admissibility of Conologue's sentence, the trial court stated:
"Yes, I am not going to let that in at all. It's not a relevant mitigating circumstance in this case."
Appellant argues on appeal that Conologue's sentence was a "relevant mitigating circumstance" and that the trial court erred in excluding it from the jury's consideration. We disagree.
In Beck v. State, 396 So.2d 645, 663 (Ala. 1981), the Alabama Supreme Court concluded that "[a]t the sentencing hearing before the jury, the [trial] court must permit the defendant to introduce any matter relating to any mitigating circumstances including those enumerated in Code 1975, § 13-11-7." *345 An alleged accomplice's sentence[2] is not one of the mitigating circumstances enumerated in § 13-11-7. But is it, nevertheless, within the scope of this general mandate by the Alabama Supreme Court?
The answer to this question is inferred from the sentencing principles espoused and discussed by the United States Supreme Court in a number of cases which involved the possible imposition of the death penalty. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). The principles in Gregg, Jurek, and Woodson, quoted by the Alabama Supreme Court in Beck v. State, 396 So.2d 645, 662-663, were summarized by the United States Supreme Court in Lockett v. Ohio, supra.
In Lockett, the court noted that the uniqueness of the individual convicted of a capital felony was an essential consideration in selecting an appropriate sentence. The court, therefore, stressed the need for "individualized sentencing" in capital felony cases. In explaining the scope of "individualized sentencing," the court stated that the "sentencer ... [must] not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense." Lockett v. Ohio, 438 U.S. at 604, 98 S.Ct. at 2964 [emphasis added]. The court footnoted, however, that "evidence not bearing on the defendant's character, prior record or the circumstances of his offense" could be properly excluded as irrelevant by the trial court. Lockett v. Ohio, 438 U.S. at 604 N. 12, 98 S.Ct. at 2964 N. 12 [emphasis added].
The United States Supreme Court has had two recent opportunities to apply the "individualized sentencing" principles summarized in Lockett. Eddings v. Oklahoma, supra; Enmund v. Florida, supra. In Eddings, the court concluded that evidence of defendant's troubled childhood should have been considered by the sentencer as a mitigating factor because it obviously had a bearing on that defendant's character. In reviewing the circumstances of the offense in Enmund, the court held that that defendant, a non-triggerman, could not be sentenced to death absent a showing that he had had a separate intent to kill. The court focused on Enmund's conduct, on his "culpability," rather than the "culpability" of those who actually shot the victims.
Applying the principles of Lockett, in light of Eddings and Enmund, to the instant case, we have concluded that an alleged accomplice's sentence is not within the scope of the general mandate of the Alabama Supreme Court stated in Beck v. State. As the trial court noted, an alleged accomplice's sentence is a product of the aggravating and mitigating circumstances applicable to the alleged accomplice. In the sentencing phase of the trial, the fact that an alleged accomplice did not receive the death penalty is no more relevant as a mitigating factor for the defendant than the fact that an alleged accomplice did receive the death penalty would be as an aggravating circumstance against him. Simply put, an alleged accomplice's sentence has no bearing on the defendant's character or record and it is not a circumstance of the offense.
As outlined in Beck v. State, supra, the consideration of accomplices' sentences, as well as sentences for those committing similar crimes, is a function properly reserved for the appellate courts. Beck v. State, 396 So.2d at 664. This "individualized" appellate review provides additional assurance *346 against possible arbitrary and capricious impositions of the death penalty.
In the instant case, Conologue, as confirmed by the appellant's own admission, was not a party to the shooting. Conologue remained in the car during the entire episode. Apparently, Conologue pleaded guilty to a lesser offense and accepted a sentence of twenty-eight years' imprisonment. The record is quite clear that appellant's "culpability" justified a sentence of death, even though Conologue's "culpability" did not. See Enmund v. Florida, supra. On this basis, appellant's death sentence is neither inappropriate, nor disproportionate. See Dobard v. State, 435 So.2d 1338 (Ala. Cr.App.1982).

VI
During the sentencing phase of the trial, the trial court instructed the jury: "Your verdict must be unanimous. All 12 of you must agree before you can reach any punishment verdict in this case. Any punishment verdict must be the verdict of each and every one of you." The appellant's contention that the instruction constituted reversible error, is without merit.
The procedures to be followed in the sentencing phase of the bifurcated jury trial in capital felony cases for conduct occurring before July 1, 1981 (the effective date of Alabama's new capital felony statute, §§ 13A-5-39 through -59, Code of Alabama 1975), are outlined in Beck v. State, 396 So.2d 645 (Ala.1981). There is no authorization in Beck for anything less than a unanimous jury verdict.
The appellant correctly cites the mandate in Beck that "[i]f the jury cannot agree on a sentence of death, the defendant shall be sentenced to life imprisonment without parole." 396 So.2d at 663. This mandate, however, is an instruction for the trial court, not for the jury. Beck does not suggest, and we can find no other support for appellant's contention, that a defendant in a capital felony case is entitled to have the jury instructed as to the consequences of a "hung" jury during its punishment deliberations.
For analyses from other jurisdictions of similar issues, with reference to unanimous verdict instructions, see: Aldridge v. State, 351 So.2d 942 (Fla.1977), cert. denied, 439 U.S. 882, 99 S.Ct. 220, 58 L.Ed.2d 194 (1978); Jones v. State, 381 So.2d 983, 992 (Miss.), cert. denied, 449 U.S. 1003, 101 S.Ct. 543, 66 L.Ed.2d 300 (1980); State v. Houston, 593 S.W.2d 267, 278 (1980); State v. Adams, 277 S.C. 115, 283 S.E.2d 582 (S.C. 1981); Justus v. Commonwealth, 220 Va. 971, 266 S.E.2d 87, 92 (1980), cert. denied, 455 U.S. 983, 102 S.Ct. 1491, 71 L.Ed.2d 693 (1982); State v. Smith, 305 N.C. 691, 292 S.E.2d 264, 276 (N.C.1982).
Moreover, even though the trial court refused to instruct on the effect of a "hung" jury, the appellant did just that in his closing argument before the jury. The appellant told the jury that "[i]f any one of you disagrees [with the death penalty] and thinks that he should live there would be no verdict returned and he [w]ill automatically [be] sentenced to life without parole."

VII

A
The day after the appellant shot and killed Mr. Morris in Alabama, he and his accomplices (Almedeo and Conologue) committed additional offenses in Georgia, for which the appellant received convictions for murder and criminal assault. Although these Georgia offenses occurred after the instant capital offense, the trials and subsequent convictions occurred before the sentencing phase hearing in the trial below.
During the sentencing phase hearing before the jury, the State presented evidence of these two previous convictions for felonies "involving the use or threat of violence to the person" as evidence of the aggravating circumstance listed as § 13-11-6(2), Code of Alabama 1975. The appellant argues that the trial court erred in admitting this evidence because these crimes were not felonies for which he was "previously convicted," as required by § 13-11-6(2). Appellant's *347 theory is that the "previously convicted" language of § 13-11-6(2) refers only to convictions for offenses that took place before the capital felony for which the defendant is being sentenced.
There is no support for appellant's theory. Section 13-11-6(2) provides, as one of the aggravating circumstances that can be used to justify imposition of the death penalty, that: "The defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person." (Emphasis added.) In light of the fact that the aggravating circumstances enumerated in § 13-11-6 cannot be considered as such until the time of sentencing, the "previously convicted" language must refer to convictions received prior to the sentencing hearing.[3]
Had the legislature intended that only convictions for offenses which occurred prior to the capital offense for which the defendant was on trial be considered in aggravation, it could have used language similar to that used in the punishment enhancement provisions of Alabama's Habitual Felony Offender Act, § 13A-5-9, Code of Alabama 1975. Section 13A-5-9(a) prescribes enhanced punishment "[i]n all cases when it is shown that a criminal defendant has been previously convicted of any felony and after such conviction has committed another felony." (Emphasis added.) This language is plain and unambiguous and mandates that the convictions used to enhance punishment under the Habitual Felony Offender Act must have occurred prior to the commission of the offense for which the defendant is being sentenced. Burgess v. State, 412 So.2d 298 (Ala.Cr.App.1982).
Penal statutes must be strictly construed. Watson v. State, 392 So.2d 1274 (Ala.Cr. App.1980), cert. denied, 392 So.2d 1280 (Ala. 1981). Strict construction of § 13-11-6(2), in light of the distinguishable language of § 13A-5-9(a), leads to the conclusion that where the defendant in a capital felony trial has been convicted of a "felony involving the use or threat of violence to the person" at any time prior to the sentencing phase of his capital felony trial, this other felony can be used as an aggravating circumstance, even if it was perpetrated after the capital offense for which the defendant is being sentenced.
The appellant argues that the "previously convicted" language contained in both § 13A-5-9(a) and § 13-11-6(2) should be construed so as to give both statutes the same effect. The fallacy of this argument is obvious when the "previously convicted" language is read in context in each statute, as shown above.
Furthermore, in the sentencing phase of a capital felony trial the sentencer has the duty of examining all the evidence of the convicted capital felon's character, presented by the appellant, up to the time of sentencing to determine whether or not the death penalty is appropriate. Other violent felony offenses committed by this capital felon demonstrate a propensity for violence, a trait which should also be considered by the sentencer, if properly proven. The requirement of a conviction merely insures the defendant that false accusations and mere allegations will not be used as evidence of an aggravating circumstance against him. Only those violent felonies which have resulted in convictions prior to the sentencing phase hearing meet the requirements for aggravating circumstances.
For similar analyses in other jurisdictions see: Gates v. Georgia, 244 Ga. 587, 261 S.E.2d 349, 356 (1979), cert. denied, 445 U.S. 938, 100 S.Ct. 1332, 63 L.Ed.2d 772 (1980); Jones v. State, 381 So.2d 983, 994 (Miss.), cert. denied, 449 U.S. 1003, 101 S.Ct. 543, 66 L.Ed.2d 300 (1980); Lucas v. State, 376 So.2d 1149, 1152-1153 (Fla.1979).

B
There remains the question of the sufficiency of the State's proof of these prior felony convictions.
*348 The only proof presented during the sentencing phase hearing was the transcribed testimony of the appellant, under oath, at a previous sentencing phase hearing, wherein he admitted that he had been convicted in Georgia of murder and criminal assault.[4]
The appellant contends that this proof was insufficient because it did not include proof that he was represented by counsel in the Georgia proceedings. The requirement of such proof was vitiated, however, because the appellant admitted these convictions under oath. Donahay v. State, 287 Ala. 716, 255 So.2d 599 (1971); Nilson v. State, 412 So.2d 1262 (Ala.Cr.App. 1982), and cases therein cited.
But was the State required to present certified copies of the judgments of the Georgia convictions? In this instance the answer is no. Although the appellant challenged the chronology of these prior offenses and convictions and asserted, as error, the failure of the State to show representation by counsel, he has never questioned the existence of these convictions or the accuracy of his prior recorded admissions. The validity of the convictions was not in dispute. Since the jury was properly presented with appellant's admission of these prior convictions, the State was, thereby, relieved of the burden of presenting certified copies of the judgments of the Georgia convictions. Donahay v. State, supra; Nilson v. State, supra; Miliner v. State, 414 So.2d 133 (Ala.Cr.App.1981); Crittenden v. State, 414 So.2d 476 (Ala.Cr. App.1982).

VIII
As part of appellant's former testimony introduced to prove the prior Georgia convictions, the State also read into evidence several of appellant's prior statements concerning his involvement (the day before he shot Mr. Morris) in the robbery in Mississippi, an offense for which the appellant was neither tried nor convicted prior to the sentencing hearing. The State also made reference to the Mississippi robbery in closing argument, but pointed out that it did not result in a conviction. The appellant contends that these admissions, during the sentencing hearing, of evidence of an alleged offense which did not result in a conviction, constituted reversible error.
The State maintains that any errors committed by introducing evidence of the alleged Mississippi robbery were harmless in this instance. The State explains that the Mississippi robbery had already been presented to this same jury during the guilt phase of the trial (and resubmitted with the rest of the guilt phase evidence at the beginning of the sentencing hearing), and that it was never claimed as proof of an aggravating circumstance against the appellant. In fact, in closing argument during the sentencing phase of the trial, the State claimed, as evidence of the aggravating circumstance enumerated in § 13-11-6(2), only the two Georgia offenses for which the appellant had been previously convicted. Likewise, in instructing the jury as to what aggravating circumstances they were permitted to consider in determining punishment, the trial court made reference to only the two Georgia convictions.
Therefore, the issue in this instance is whether or not the mere mention, during the sentencing phase of a capital felony trial, of an alleged but unadjudicated offense, requires remandment for a new sentencing phase hearing.
It is clear in Alabama that a new sentencing hearing is mandated when a sentence is based on improper aggravating circumstances even though proper aggravating circumstances are also found. Bufford v. State, 382 So.2d 1162 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala.1980). See also Cook v. State, 369 So.2d 1251 (Ala. 1979); Bracewell v. State, 401 So.2d 124 (Ala.Cr.App.), cert. denied, 401 So.2d 130 (Ala.1980); Nelson v. State, 405 So.2d 392 *349 (Ala.Cr.App.1980), rev'd on other grounds, 405 So.2d 401 (Ala.1981).
In Bufford, the trial court listed, as aggravating circumstances, convictions that were not felonies involving violence to the person. Because the trial court weighed these improper aggravating circumstances against the mitigating circumstances and thereby based its sentence upon them, the case was remanded for a new sentencing hearing. In Bracewell, the cause was similarly remanded because the trial court clearly considered the defendant's participation in other non-violent crimes as an aggravating circumstance, outweighing two mitigating circumstances.
Cook and Nelson involved trial court findings with reference to the existence or nonexistence of the mitigating circumstance enumerated in § 13-11-7(1), Code of Alabama 1975. Section 13-11-7(1) states as a mitigating circumstance the fact that "[t]he defendant has no significant history of prior criminal activity." In Nelson, the trial court found that the defendant had a "significant history of prior criminal activity," and it listed that fact as an aggravating circumstance upon which it based its sentence. The trial court erred because it considered the defendant's prior criminal activity as an aggravating circumstance without regard to the § 13-11-6(2) requirements that only convictions for felonies involving violence be considered as aggravating circumstances. The fact that a defendant has a significant history of prior criminal activity, which does not fit § 13-11-6(2) (or § 13-11-6(1)) requirements, might be used, in certain instances, to negate the § 13-11-7(1) mitigating circumstance, but it cannot be properly considered as an aggravating circumstance. Nelson v. State, supra. A similar error occurred in Cook, where the trial court qualified the § 13-11-7(1) mitigating circumstance by determining that although his prior criminal activity was not significant, "he does have a history" and by detailing this history in its findings of fact. The history improperly considered by the trial court included a pending robbery charge.
Based on these cited cases, a new sentencing hearing would be mandated in this instance had the trial court permitted the jury to consider, or had the trial court itself considered, the alleged Mississippi offense as an aggravating circumstance. As noted above, however, the evidence of the Mississippi offense was not considered as an aggravating circumstance. The only evidence of this offense was introduced through appellant's own statements. The Mississippi robbery had first been mentioned during the guilt phase hearing before the same jury, when the appellant's confession was read into evidence. It was mentioned again in the sentencing phase hearing merely as part of appellant's prior recorded testimony in which he admitted the two prior Georgia convictions. The trial court carefully explained to the jury what conduct was covered by the § 13-11-6(2) aggravating circumstance and permitted it to consider only the two Georgia convictions as evidence thereof. The trial court did not consider the Mississippi offense either in aggravation or in negation of the § 13-11-7(1) mitigating circumstance and did not mention it in its detailed findings of fact. Moreover, the trial court listed as a mitigating circumstance that "the defendant at the punishment hearing proved his good character and life prior to the act of killing the deceased, George Morris, on the 28th day of September, 1977." Under these circumstances, a new sentencing phase hearing is not required.
We have carefully searched the record in this cause and have found no errors adversely affecting the substantial rights of the appellant. As noted above, the trial court's findings with reference to the aggravating and mitigating circumstances were supported by the evidence.
Furthermore, we have independently determined that the sentence of death is indeed appropriate for this appellant under these circumstances. We have independently weighed the aggravating and mitigating circumstances and have concluded that the aggravating circumstances outweigh *350 the mitigating circumstances. The imposition of the death penalty in this instance has not been influenced by passion, prejudice, or any other arbitrary factor. Finally, this sentence of death is in line with the punishment imposed in similar cases, considering both the nature and circumstances of the offense, and the character and record of the appellant.
The conviction and sentence of death for this appellant must, therefore, be affirmed.
AFFIRMED.
All the Judges concur.
 EXHIBIT "A"
 STATE OF ALABAMA IN THE CIRCUIT COURT OF
 COLBERT COUNTY COLBERT COUNTY, ALABAMA
 STATE OF ALABAMA CASE NO. CC 78-53
 vs.
 DAVID LEROY COULTER,
 Defendant

ORDER OF COURT

ON IMPOSITION OF DEATH PENALTY
The defendant in this case, David Leroy Coulter was charged by indictment of the Grand Jury of the Circuit Court of the 31st Judicial Circuit of Alabama in and for Colbert County, Alabama, with the capital offense of robbery when the victim is intentionally killed by the defendant. This charge is brought under the provision of the Alabama Death Penalty Statute, Code of Alabama, 1975, Section 13-11-1 et seq., more specifically section 13-11-2(a)(2).
This case came on to be heard before the Court and the jury of twelve men and women duly empaneled and sworn as required by law. The jury after hearing the evidence and the Court's oral charge as to the applicable law, including the lesser included offense of Murder in the First Degree, retired to deliberate and upon the consideration of the law and evidence found the defendant guilty as charged in the indictment. The jury was polled and the verdict was unanimous in finding the defendant guilty of the capital offense as charged in the indictment and not of the lesser included offense of Murder in the First Degree. The Court announced the jury's verdict on the 14th day of January, 1982, and on said date commenced a sentence hearing before the same jury as required by the Supreme Court of Alabama, in Beck v. State, 396 So.2d 645 (Ala.1980), Supreme Court 77-530. After hearing the evidence during the punishment phase and hearing the jury was again charged as to the applicable law, advising said jury that if mitigating circumstances outweighed the aggravating circumstances then the punishment would be life imprisonment without eligibility for parole, but if the aggravating circumstances outweighed the mitigating circumstances as shown by the court's charge, the verdict would be death. After due deliberation, the jury returned a verdict affixing the defendant's punishment at death. The jury was individually polled and the verdict was unanimous. This Court commends the attorneys for both the State and the defense for putting aside any attempt to emotionally influence the jury with passion, prejudice or other arbitrary factors in arriving at the punishment as shown by the jury verdict. The makeup of this jury was as follows: five white women, one black woman, five white men and one black man. This Court in its qualifications to the Jury requested as to whether or not the jurors had any bias or prejudice that would influence their verdict. By their silence, they answered in the negative. Therefore, this Court is satisfied and does find that the elements of passion, prejudice and other arbitrary factors were not present in the Jury's deliberation and findings fixing punishment at Death. The *351 Court then announced the Jury's verdict and set the 26th day of February, 1982, at 9:00 a.m. for further hearing as mandated by Section 13-11-3 and Section 13-11-4 of the Code of Alabama of 1975. At said hearing, the defendant, his trial counselors and the district attorney were present and ready to proceed.

FINDINGS OF FACT
The Court finds from the evidence introduced at trial that the defendant, David Leroy Coulter, at that time, age 19 years, shot and killed the deceased, George Morris, an elderly man, on September 28, 1977, in the store which was owned and operated by the deceased, George Morris, located on or about Highway 72, Colbert County, Alabama, while the said defendant was committing a robbery of the said George Morris. The court finds that said killing was intentional. The Court first considers the aggravating circumstances as set out and enumerated in section 13-11-6 of the 1975 Code of Alabama:
A. The Court finds from the evidence introduced at the punishment hearing before the jury that the defendant was previously convicted of a felony involving the use of threat or violence to the person, in as much as the defendant was convicted of Murder in the First Degree, and criminal attempt to rob, and received respectively a life sentence and a ten year sentence in Putnam County Superior Court, Georgia, prior to trial of this cause, which the Court finds is an aggravating circumstance under section 13-11-6(2) of the Code of Alabama of 1975;
B. The capital felony with which the defendant was charged in this cause was especially heinous, atrocious and cruel in that the Court finds from the evidence that David Leroy Coulter, the defendant, after forcing George Morris, the deceased, an elderly man, to lie face down on the floor of his store and had his accomplice take the money from the cash register the said, David Leroy Coulter, took the wallet of George Morris from his person and thereafter the said, David Leroy Coulter, kicked George Morris who offered no resistance in the head and in the back and caused his kidney to burst and then the said David Leroy Coulter, shot George Morris who was pleading for his life, offering no resistance, in the back of his head causing his death, which acts on the part of the defendant, David Leroy Coulter, the Court finds are especially brutal, unnecessarily torturous and are conscienceless and pitiless acts of brutality, constituting an aggravating circumstance under Section 13-11-6(8) of the Alabama Code of 1975.
C. The Court finds that none of the other aggravating circumstances set out in Section 13-11-6 of the Alabama Code of 1975 were found to exist in this case.
The Court now proceeds to consider mitigating circumstances as set out and enumerated in Section 13-11-7 of the Alabama Code of 1975, and other mitigating circumstances proved at the punishment hearing before the jury and at the sentence hearing before the Court.
A. The Court finds one mitigating circumstance in this cause to be the age of the defendant at the time of the commission of the crime, to-wit: 19 years. The Court further finds that the defendant at the punishment hearing proved his good character and life prior to the act of killing the deceased, George Morris, on the 28th day of September, 1977, and further finds that the evidence shows that he has shown remorse for his action since September 28, 1977.
The Court having considered the aggravating circumstances and the mitigating circumstances as they existed under the facts in this case and after weighing the aggravating and mitigating circumstances, it is the judgment of the Court that the aggravating circumstances outweigh the mitigating circumstances and that the death penalty as fixed by the jury is hereby accepted and the Court declines to reduce the sentence to Life without eligibility for parole.
It is therefore considered ORDERED, ADJUDGED AND DECREED by the Court that David Leroy Coulter is guilty of the capital offense charged in the indictment;
It is, therefore, the judgment of this Court that this defendant should be sentenced *352 to Death by electrocution on the 11th day of November, 1982.
Done and ORDERED this the 26th day of February, 1982.
 (s) Inge Johnson
 Presiding Circuit Judge
NOTES
[1] The instant appeal is from appellant's third trial in this cause.
[2] We use the term "alleged accomplice" throughout the discussion of this issue for simplicity. Bill Conologue was probably an accomplice to the robbery and probably not an accomplice to the capital felony. He was potentially a "co-defendant," but pleaded guilty to a lesser offense and, thereby, avoided a trial.
[3] In fact, in Alabama's new death penalty act, applicable to conduct occurring after the effective date of the act, July 1, 1981, the legislature specified that "previously convicted" refers to convictions "occurring before the date of the sentencing hearing." Ala.Code § 13A-5-39(6) (1975).
[4] This criminal assault conviction is the same conviction listed in the trial court's findings of fact as "criminal attempt to rob."