22 So.2d 544

## COLVIN v. STATE.
### 6 Div. 68.

Court of Appeals of Alabama.

Jan. 23, 1945.

Rehearing Denied March 27, 1945.

Reversed by Supreme Court June 7, 1945.

E. L. Dodson, of Tuscaloosa, for appellant.

Wm. N. McQueen, Acting Atty. Gen., and Forman Smith, Asst. Atty. Gen., for the State.

RICE, Judge.

Appellant was convicted of the offense of arson in the first degree, and his punishment fixed at imprisonment in the penitentiary for the term of two years. Code 1940, Title 14, Section 23.

It is without dispute that a dwelling house belonging to appellant was destroyed, or partially destroyed, by fire on the morning (about 2:15 a.m.) of Thursday, August 13th, 1943.

As the learned trial court stated the matter in his oral charge to the jury:

"Now, in this case, Gentlemen, the State claims that this defendant owned a house out on 38th avenue, I believe it is, and 9th street in the City of Tuscaloosa. The State claims that he had insurance on the house in the amount of $800.00. The State further claims that shortly before the fire he procured insurance in the amount of $600.00 on the furniture in the house; and, the State further claims that some of this furniture didn't belong to him. That he only owned an interest in other furniture, but that he procured insurance in the amount of $600.00 on this furniture in his own name. The State further claims that the burning of the house was of incendiary origin. That is, that it was set by some person; that it was not an accident and that it was set and that this defendant was in close proximity to the place a few minutes before it burned. The State further claims that the defendant had made threats shortly prior to this time to sell (we are sure this was intended to be burn) the house unless the wife would sign the mortgage or deed and let him sell it. The State further claims that this defendant had taken his clothes and radio and, I think, some other property out of the house shortly before it burned and the State claims that he is guilty of intentionally—that is, with the intent to defraud, set this house afire or procured the burning of the house—aided or procured the burning of the house in order to defraud the insurance companies who were carrying the insurance on the house and the furniture.

"Now, on the other hand, Gentlemen, the defendant claims that he did not set it afire. He claims that he did not take his clothes out of the house with the intention of setting the house afire and that it was a mere accident that some of his clothes were out of the house. That he carried some of them to the cleaners and he further claims that he was not in the house any time after six o'clock on the evening before the house burned about two o'clock the next morning and he says he had noth-

ing to do with the burning of the house. He says he was at the bus station in Tuscaloosa about the time the house burned and that he was not in that vicinity anywhere near the time the house burned and that he is not guilty of the crime."

It is of course the law that "in arson, the corpus delicti consists, not alone of a building burned, but also of its having been willfully fired by some responsible person, and burning by accidental and natural causes must be satisfactorily excluded, to constitute sufficient proof of the crime." Carr v. State, 16 Ala.App. 176, 76 So. 413.

Here, the evidence that the burned building was "willfully fired by some responsible person" consisted of the expert opinion given by E. L. (Pete) Mathews, the Chief of the Tuscaloosa Fire Department, who reached the scene of the fire an estimated approximately nine minutes after the fire began.

Mr. Mathews, who gave his qualifications as an expert as consisting of twelve years as chief of the Fire Department, and twenty-three years as assistant chief, and of his having investigated some thirty-five or forty fires of incendiary origin, was allowed to state—after detailing the aspects of the fire as observed by him—that it was his opinion that the fire—the burning of appellant's home—was of "incendiary origin." We think his testimony was properly admitted.

It is of course true that before an expert can state his opinion he must first testify to the facts on which the opinion is based—unless he is answering an hypothetical question. Brown v. Mobile Electric Co., 207 Ala. 61, 91 So. 802.

Stated another way, it is said: "The general rule is declared that, where an expert opinion is called for based upon his own knowledge of the facts, the witness should first state the facts, then his opinion or conclusion. If not on his knowledge, then the question should be hypothetical, based on facts in evidence." Blakeney v. Alabama Power Company, 222 Ala. 394, 133 So. 16, 18, citing Brown v. Mobile Electric Co., supra.

But it is also true that the qualifications of a witness to testify as an expert is a matter largely within the discretion of the trial court, and the appellate court will not reverse its ruling unless there has been an abuse of that discretion. Brown v. Mobile Electric Co., supra.

So we repeat: Under the authorities we have cited, there was no error in allowing Fire Chief Pete Mathews to state his expert opinion—basing it as he did upon facts observed by him—that the fire in question was of "incendiary origin"—by which we know he meant it was "maliciously set."

There are many other rulings on the taking of testimony to which exceptions were reserved. We have examined each of them.

Perhaps in isolated instances the trial court was in technical error in some of these rulings. But appellant is represented here by able and aggressive counsel, who has filed a rather comprehensive brief in his behalf.

And said counsel has done no more than complain at some of said rulings. In no instance does he point out, under the law, where appellant was injured in any way by same.

In fact, able counsel disposes of the whole matter in this language: "All these questions and answers are very similar in character, and constitute one gross error by the trial court in the submission to the jury as legal evidence such unreasonable and prejudicial circumstances, as to make impossible a fair trial. The prosecution proceeded on a gradual illegal and prejudicial build up."

Answering the distinguished counsel, we remark that our careful scrutiny of each exception reserved discloses that the ruling underlying same did not, in our considered opinion, exercise the slightest effect on the verdict returned by the jury.

As appellant's counsel so well says: "The evidence, all of it, and practically every detail of it, is purely circumstantial."

This being true, it of course followed that, taking the wide range allowed, there might, here and there, have been a technically erroneous ruling, involving some matter of minuscule importance—exercising, as we said, no conceivable bearing upon the verdict returned by the jury. Naturally, the State's testimony, being so developed, assumed the form of a "prejudicial"—though we do not think illegal— "buildup."

And we come now to the real contention that appellant, through his counsel—though it was our duty to examine

same regardless of counsel, Code 1940, Tit. 15, Sec. 389—urges upon us as a reason for the reversal of the judgment of conviction: That is, that the evidence failed to make a case against him fit to be submitted to the jury; or that the jury's verdict was against the overwhelming preponderance of the evidence.

We will consider that; and it is not without difficulty.

There was evidence on behalf of the State tending to show, in addition to the corpus delicti, the following, viz: Appellant owned the dwelling house which was partially destroyed by fire; he and his wife had, through their joint efforts, paid off in full the mortgage on same; the furniture in the home, a part of which was destroyed by the fire, belonged, in larger part, to his wife, though he was "joint owner" of a part of same; there was no incumbrance of any sort on any part of the furniture, or the home.

About three years prior to the fire appellant contracted tuberculosis, and spent a time in a hospital in Birmingham, Alabama.

During the time he was in the hospital in Birmingham, and afterwards, his wife, who was a graduate trained nurse, working regularly and exclusively for white people—both she and appellant being negroes—kept up the payments on the home—the furniture being, we believe, already clear of indebtedness—until it, too, was clear.

Some months prior to the fire appellant conceived the idea that it would be better for his health should he "go out West." He asked his wife to join with him in either mortgaging or selling the home, to get the necessary money. She refused. He was offended.

They continued to reside in the home; but he occupying one side; she the other.

More than once he importuned her to join with him in either mortgaging or selling the home—so that he might get the money required to "go out West." She continued to refuse.

Upon the last of such occasions he said to his wife, this: "Remember it's (the home—dwelling) in my name and I don't see any point in having property in my name and I can't sell it or mortgage it without your signature. I want some money, and I'm going to get the required amount of money. I'll see it in ashes before I'll let you keep me from doing what I want to."

Subsequent to the time of making this threat—or statement—and prior to the date of the fire, appellant went, without his wife's knowledge, or consent, and procured a policy of fire insurance on all the furniture, having himself made the sole beneficiary in said policy—the house, of course, having been all along insured against loss by fire, with appellant as beneficiary.

Appellant's wife's first cousin, a school boy, who had been living in the home with him and his wife, was forced by appellant to "move out" and cease residing there approximately two weeks prior to the fire.

On the afternoon—at about 6 o'clock—preceding the night during which the fire occurred, appellant went by the house—no one being there at the time—and removed from same his radio; some two or three suits of his clothes; perhaps his overcoat; and one or two pairs of his shoes—these articles later being found to have been preserved by him, either in a filling station which he operated, or in a trunk or box of his automobile.

Appellant, who operated a taxi at night, and on the night of the fire, brought a passenger from the Bus Terminal in the City of Tuscaloosa to the passenger's home located only five blocks from appellant's home which was burned. This passenger was deposited at his home, located as mentioned, at exactly 1:40 a.m.—approximately thirty-four minutes prior to the inception of the fire.

After the fire, and after appellant was released from custody, he went to this passenger; and after learning that said passenger had given a written statement to the fire marshal concerning his ride home with appellant on the night—or morning—of the fire, expressed his regret that said passenger had done so. Either then, or on a later visit to the passenger, appellant asked him if he could not say that it was 12:40 a.m., rather than 1:40 a.m., when appellant delivered him to his home as aforesaid. Appellant asked this passenger to either go with him, or go, to appellant's lawyer's office. But the said passenger refused all requests.

After the fire, and in the small hours of the same morning, appellant, driving an automobile—he had been out, presumably operating a taxi all the night—came down the street on which he lived, and, without stopping, drove by his home and on around the block, and started on away from the

146

locality—he said, when accosted by the police officer who watched him drive by his own home without stopping, and who arrested him a block or so away, that he "thought he would go up to the Fire Department" and ask what had happened.

The above, we believe, is a fair account of what the State's testimony tended to show.

Appellant's claim, as to the transaction, is correctly stated in the excerpt from the trial court's oral charge hereinabove quoted.

We borrow, and quote, as expressing our views—and the law—the fourth headnote to the report of the case of Bryant v. State, as reported in 116 Ala. 445, 23 So. 40. It is: "To warrant a conviction of the defendant in a criminal case, the evidence must exclude to a moral certainty every reasonable hypothesis but. that of his guilt, and a charge which so instructs the jury, and further instructs them that 'No matter how strong these circumstances are, they do not come up to the full measure of proof which the law requires, if they can be reasonably reconciled with the theory that the defendant is innocent,' asserts a correct legal proposition and should be given."

Measuring the evidence in the case by the law just quoted, it is our opinion that it made a case against the appellant fit, in the first instance, to be submitted to the jury trying the case.

And, that body having decided that appellant was guilty as charged, and the able and just judge presiding at the trial, and seeing and hearing the witnesses testify, having, after what appears to have been a full and complete examination of the testimony—we say this because of the voluminous and minutely particularized motion filed for a new trial—having refused to set the jury's verdict aside, we, in the light of the presumption that prevails, feel unwarranted in adjudging him in error.

It results that it is our opinion that the judgment appealed from should be affirmed.

And it is so ordered.

Affirmed.

## On Rehearing.

It seems. there is really nothing of value we could add to what we have said in our original opinion.

But in answer to the vigorous insistence of able counsel filing brief here on appellant's application for rehearing, that the verdict of the jury rested upon mere conjecture, surmise, or supposition, we have thought it well to set down here a distinction which our Supreme Court has made between these, and legal inference—upon which, of course, a jury may well rest its verdict. That court has well said: "Inference, in legal parlance, as respects evidence, is a very different matter from supposition. The former is a deduction from proven facts * * * ; while the latter requires no such premise for its justification." Miller-Brent Lumber Co. v. Douglas, 167 Ala. 286, 52 So. 414, 415.

Here, we have set out the "proven facts," i.e., what the jury had a right to conclude were "proven facts." From these, we reaffirm our view that the jury had a perfect right to infer—conclusively—appellant's guilt.

The application for rehearing is overruled.

Overruled.

PER CURIAM.

Reversed by Supreme Court, 247 Ala. 55, 22 So.2d 548.