401 So.2d 124 (1980)
Debra BRACEWELL, alias
v.
STATE.
4 Div. 663.
Court of Criminal Appeals of Alabama.
January 22, 1980.
Rehearing Denied February 26, 1980.
Certiorari Granted October 20, 1980.
Certiorari Granted October 20, 1980. See 101 S.Ct. 312.
*125 BOOKOUT, Judge.
This cause was remanded with instructions by the Supreme Court of Alabama to the Court of Criminal Appeals "to further review the entire record of the proceedings below, including the propriety of the sentence of death." Bracewell v. State, 401 So.2d 123 (1979).
Pursuant to these instructions, this Court has carefully reviewed the entire record, including all of the circumstances presented at trial with reference to both the "Miranda" predicate and the "voluntariness" predicate, and we find that a proper predicate was laid at trial in each instance.

I
We are of the opinion that there was a sufficient voluntariness predicate laid and that the trial judge did not improperly limit the appellant's opportunity to inquire into the circumstances surrounding her written confession. We likewise conclude that the circumstances of the appellant's interrogation were not as severe and overpowering as those in Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), referred to in the dissent of Judge Tyson.
We find that the Miranda predicate was proper. We conclude that both elements lacking in Square, Marcus, Trott and United States ex rel. Williams, referred to in the dissent, are sufficiently covered in the instant Miranda warning.

II
The conviction should be affirmed, but the cause should be remanded with directions for the trial judge to conduct another sentencing hearing and only consider aggravating circumstances set out in § 13-11-6, Code of Alabama 1975.
More specifically, the trial court considered the appellant's participation in grand larceny and other crimes not involving "the use or threat of violence to the person" as outweighing the mitigating circumstances it had earlier found. Pursuant to § 13-11-6(2), the court could only consider whether the appellant "was previously convicted of another capital felony or a felony involving the use or threat of violence to the person." It should be noted that the trial court was not listing other offenses for the purpose of negating the mitigating circumstance enumerated in § 13-11-7(1), that the appellant had no significant history of prior criminal activity. To the contrary, the trial court's finding in this regard was to specifically outweigh two other mitigating circumstances as an aggravating circumstance and was thus improper under the statute.
Pursuant to the mandate of the Alabama Supreme Court in remanding this cause to this court, we would likewise direct the trial court to carefully reconsider the imposition of the death sentence where two mitigating circumstances weigh heavily in the appellant's favor, i. e., her young age and the dominance of her husband, her senior by several years.
*126 AFFIRMED, REMANDED WITH DIRECTIONS.
HARRIS, P. J., and BOWEN, J., concur in the above.
DeCARLO, J., concurs in Part I and concurs specially in Part II.
TYSON, J., concurs in Part II and dissents as to Part I.
TYSON, Judge, dissenting in part and concurring in part.

I
Sheriff W. E. Harrell testified that, at 1:10 p. m. on January 23, 1978, after questioning Debra Bracewell on at least four or five prior occasions over a three month interval, he gave the following Miranda type warning just prior to an interrogation in his office at the Covington County Courthouse. Also present was Mr. Marlon Brewer, Criminal Investigator for the State Department of Public Safety, Bureau of Investigation, and during part of the interrogation one or more of the deputies were in and out of the office at the time. Mrs. Linda Cassady came in and took down the statement, which was reduced to writing, read back to the appellant, and then executed by her (Vol. II, R. p. 324), and is as follows:
"A. `Number One. You have the right to remain silent. Number Two. Anything you say can and will be used against you in a court of law. Number Three. You have the right to talk to a lawyer and have him present with you while you are being questioned. Number Four. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish. Number Five. You can decide at any time to exercise these rights and not answer any questions or make any statements.' After we did that, we told her or asked her rather, did she understand each of these rights that we had explained to her and she replied that she did. We asked her then, at that time, having these rights in mind, do you wish to talk to us now. She replied that she did. Then we read another paragraph on this same page known as the waiver of rights. It says, `I have read or had read to me a statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promise or threat has been made to me and no pressure of any kind has been used against me to get me to make a statement.'" (Emphasis supplied.)
Investigator Brewer stated that he, too, read the Miranda type warning to Debra Bracewell on the afternoon of January 23, 1978, which Miranda warning is as follows (Volume II, R. p. 304):
"A. I advised her from this form. `You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements.' And, I asked her if she understood those. And she stated she did. I asked her, having those in mind and understanding them, was she willing to talk with us and she said she was.
"Q. All right. At that time, did you ask her to sign it?
"A. Yes, I did.
"Q. And did she sign it in your presence?
"A. Yes, she did.
"Q. Did you witness it in her presence?
"A. I certainly did.
"Q. And did Linda Cassady witness it then?
"A. Yes, she did. In her presence."
(Emphasis supplied.)
I do not consider either of these warnings to be models to emulate because of the "futuristic" aspect of the warnings above set forth and underscored. See Square v. *127 State, 283 Ala. 548, 219 So.2d 377 (1969); Marcus v. State, 50 Ala.App. 526, 280 So.2d 786, cert. denied, 291 Ala. 350, 280 So.2d 793 (1973); Trott v. State, 51 Ala.App. 40, 282 So.2d 392, cert. quashed, 291 Ala. 800, 282 So.2d 402 (1973); United States ex rel. Williams v. Twomey, 7 Cir., 467 F.2d 1248 (1972).
However, I do consider the type of Miranda warning here given, and the form of same to be one factor to be considered in determining whether or not the trial court made a proper determination of the "voluntariness" of the appellant's statement.
In Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); and Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961), the United States Supreme Court set forth a number of criteria which are used by that Court in determining the "voluntariness" of an incriminatory statement.
From these cases, I learn that the age of the party, the opportunity to confer with family, or counsel, if the party be a minor, the length of time of incarceration before a statement is given, the opportunity to confer with counsel, the mental condition of the accused, the educational background of the accused; and the "likelihood of the truth" of the statement is not the proper criteria "standing alone" to pass upon this matter.
Because only the circumstances surrounding the accused's statement given in the sheriff's office, allegedly on the afternoon of January 23, 1978, were before the trial court, after reviewing the entire circumstances leading up to the final incriminatory statement, I am of the opinion that the wrong test was used by the trial court in determining the voluntariness of Debra Bracewell's statement, and, therefore, would reverse and remand this cause for these reasons. White v. State, 260 Ala. 328, 70 So.2d 624 (1954); and Myhand v. State, 259 Ala. 415, 66 So.2d 544 (1953).
Debra Bracewell was born April 17, 1960 (Volume II, R. p. 290). At the time of her arrest on November 4, 1977, she was seventeen years of age. She was an individual who had been married to her husband, Charles Bracewell, a man twenty-six years of age, for approximately ninety days. She had an eighth grade education.
Because it was necessary for this Court to look carefully at the testimony offered at the sentencing hearing on the question of aggravating, as well as mitigating, circumstances which exist, in order to put the total interrogation in this cause in its proper perspective, I also note the following.
Investigator Brewer testified at the sentencing hearing (see §§ 13-11-1 through 13-11-9, Code of Alabama 1975) that he first met Debra Jeanene Bracewell on or about August 18 or 19, 1977, at the Police Department in Opp, Alabama. He interrogated her with reference to some allegedly stolen property and read to her a "standard Miranda card" at that time (Volume III, R. pp. 411-412). He stated the conversation took place in the Chief of Police's office and that he interrogated her concerning some shoplifting, which allegedly took place at the T G & Y store in Opp. He stated that he also interrogated her with reference to an alleged robbery of a "Jr. Food Store" in Andalusia in which she and her husband were involved. Investigator Brewer also stated that he interrogated her concerning an alleged shoplifting incident concerning a hardware store in Samson, Alabama, and also an alleged robbery of a Jr. Food Store in Samson. Investigator Brewer stated that he interrogated Debra Bracewell on other occasions later, but that he next talked with her concerning another incident in Elba, Alabama, on November 2, 1977, and this involved the alleged burglary of a service station by removing some chain saws.
Brewer further related that he also questioned Debra Bracewell concerning some alleged incidents involving a house trailer located on the Geneva Highway out of Enterprise and that allegedly some guns were taken from a "burglarized house trailer." Investigator Brewer related that he read Mrs. Bracewell a Miranda card on each occasion that he talked with her, and that she was not threatened, abused, or offered any hope of reward to make these admissions.
*128 Insofar as the record before us is concerned, it does not establish that any of these incidents referred to in this questioning over several months by Investigator Brewer, Sheriff Harrell, and others, were brought to trial, and the appellant duly indicted and charged therefor. I will comment further on this aspect of the matter in my treatment of the sentencing hearing (see Part II, infra).
Suffice it to say here that Investigator Brewer related that he first talked with Mrs. Bracewell on November 2, 1977, concerning the alleged robbery and murder of one Rex Carnley, the case on present review, on November 2, 1977, that he made notes from time to time, but did not write down or record a written statement until January 23, 1978. Investigator Brewer indicates that he interrogated Mrs. Bracewell six or eight times, "perhaps ten at the most," during the interval of November 2, 1977 to January 23, 1978. No written record was offered other than the testimony of Investigator Brewer from notes which he allegedly made following conversations with Debra Bracewell. Brewer also stated that Debra's husband, Charles Bracewell, was being held at that time for an alleged burglary of the home of Bracewell's sister, who lived just across the Florida line, and the removal of a stereo set, some records and a television set from the home of Ramona Roberts, Charles Bracewell's sister. Brewer also testified at the sentencing hearing that, at some time during January, 1978, he had gotten an oral statement from both Charles and Debra Bracewell and that following "an oral conversation" held on January 19, 1978, in the Sheriff's Office, Debra Bracewell allegedly told Brewer and Sheriff Harrell that she had to "step up on a stool in order to reach a pistol" and allegedly fired the weapon at the deceased, Rex Carnley.
On January 20, 1978, she agreed to ride with the two officers and show them where her husband, Charles Bracewell, had allegedly thrown out the wallet belonging to the victim, Rex Carnley. It, therefore, appears from the record that Charles Bracewell and Debra Bracewell were confronted with oral statements allegedly given the officers, which were conflicting, during January, 1978, and, as a result of this, Debra Bracewell took the officers in an effort to locate the wallet of the victim on January 20, 1978, and subsequently gave an oral inculpatory statement, which was in the presence of Sheriff Harrell and Investigator Brewer, and taken down by Mrs. Cassady, then reduced to written form and executed by Debra Bracewell.
The essence of Debra Bracewell's statement is that she and her husband went to the store of Rex Carnley on August 14, 1977, knocked on the door and were admitted by Carnley. They talked with him for a few moments and discussed a purchase. At that point Charles Bracewell pulled a gun on Carnley and directed his wife to obtain a pistol from underneath the counter and hold it on the deceased, Rex Carnley. Mrs. Bracewell acted as directed by her husband and subsequently fired the pistol once at Carnley's head, then dropped the pistol and saw her husband pick it up and fire several shots at Carnley's head. She ran out of the store, and shortly thereafter her husband emerged with the pistol and the deceased's billfold in his hands. Her statement also indicates that they then got into their automobile and her husband counted out more than $1200.00 which he removed from the billfold of the victim. They drove away and her husband discarded the victim's billfold.
Mrs. Linda Cassady, who took down the oral statement given on January 23, 1978, testified at the sentencing hearing that she accompanied Debra Bracewell, together with Deputy Sheriffs George Szpek and Jim Stallings, and they looked in an area near Samson, called Peery, in an effort to locate the missing wallet.
Statements were presented from a number of persons who were either cousins or relatives of Charles Bracewell, or friends of the couple, who saw them on occasions following their marriage, during August through October, 1977. Each of these individuals described Debra Bracewell as being *129 without any members of her family. They stated that Debra Bracewell seldom spoke and only seemed to want to be at her husband's side, hugging or holding on to him. She did not visit or chat with other women and appeared to be totally under the influence of her husband, Charles Bracewell.
Another factor brought out was that Debra Bracewell's family had moved to Louisiana, and that Debra and Charles were staying with either his relatives or friends during the sixty to ninety day period that they were married before their arrest and incarceration in the Covington County Jail.
This Court should apply the "totality of circumstances" doctrine to the factors hereinabove set forth. One conclusion is inescapable when this record is so considered, and it is that Debra Bracewell was frightened by statements made to her by the officers, that she was without family, friends, or an attorney to advise her, and, finally, after repeated interrogation over a three months period, gave a written statement. I cannot consider this as the product of a willing individual freely giving her version of matters which happened several months prior thereto. Rather, the picture emerges of a person of limited education, with limited mental capacity, under the domination of her husband, some years older, who led her over a three months period on what might be termed a crime spree involving several counties in two states.
Because of her age and educational and mental background, I cannot conclude that the statement here admitted in evidence was the product of a rational intellect, knowingly and intelligently made by voluntarily waiving her privilege against self-incrimination and her right to have appointed counsel. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
I would, therefore, hold that the trial court erroneously admitted appellant's statement of January 23, 1978, into evidence and unduly and improperly restricted the inquiry as to the "voluntariness" of same. The clear evidence established at the "sentencing hearing" shows that such was not voluntary, but rather given following a protracted interrogation over a three months interval during which she was without family, friends, or legal counsel. Her first contact with legal counsel, insofar as this record reveals, occurred approximately a month after she gave the alleged written statement, counsel having been appointed by the trial court on February 22, 1978. See Duncan v. State, 278 Ala. 145, 176 So.2d 840 (1965), and cases cited.
I, therefore, conclude that the appellant's confession was not voluntarily, intelligently, and understandingly given, and would therefore reverse and remand this cause. Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), and authorities herein cited.

II
Mindful of our obligation to also consider the "sentencing hearing," I join in Part II of the majority opinion.
The authorities in Alabama are legion that incriminatory statements involving other criminal offenses which have not been made the subject of indictment, trial and conviction may not be introduced in evidence in a criminal proceeding, Headley v. State, 51 Ala.App. 148, 283 So.2d 458 (1973), and authorities cited, nor may such unadjudicated criminal charges be used as evidence in a sentencing hearing involving the death penalty. Cook v. State (Ala.), 369 So.2d 1251 (1978).
The trial court erred in its consideration of these matters. I, therefore, would reverse and remand this hearing and the imposition of the death penalty in this cause.
DeCARLO, Judge, concurs in Part I and specially in Part II.
I concur in Part I of the foregoing opinion. I concur in the remandment for a new sentencing hearing as set forth in Part II of the opinion.
However, I would make no directions to the trial court concerning the sentencing hearing.