447 So.2d 815 (1983)
Debra BRACEWELL, alias
v.
STATE.
4 Div. 981.
Court of Criminal Appeals of Alabama.
May 31, 1983.
Rehearing Denied July 5, 1983.
*817 Donald F. Colquett, Opp, and J. Fletcher Jones, Andalusia, for appellant.
Charles A. Graddick, Atty. Gen., and William D. Little, Asst. Atty. Gen., for appellee.
HARRIS, Judge.
The instant appeal is from Debra Bracewell's second trial for the capital murder of Rex Carnley by shooting him with a pistol during the commission of a robbery. Her original conviction and sentence of death were eventually overturned on the authority of Beck v. State, 396 So.2d 645 (Ala. 1980). See, Bracewell v. State, 401 So.2d 119 (Ala.Cr.App.), rev'd, 401 So.2d 123 (Ala. 1979), on remand, 401 So.2d 124 (Ala.Cr. App.), cert. denied, 401 So.2d 130 (Ala.), vacated, 449 U.S. 915, 101 S.Ct. 312, 66 L.Ed.2d 143 (1980), after remandment, 401 So.2d 130 (Ala.Cr.App.), cert. denied, 401 So.2d 130 (Ala.1981).
*818 As a result of her second trial for this offense, the appellant, Debra Bracewell, was found guilty as charged and, after proper sentencing procedures were followed, she was sentenced to life imprisonment without parole.
Several issues are presented for our consideration, but the sufficiency of the State's evidence is not challenged on this appeal.
The facts and circumstances surrounding the murder of Rex Carnley are essentially the same as stated in our opinions pertaining to appellant's first trial. Bracewell v. State, 401 So.2d 119, supra.
Rex Carnley was last seen alive by his wife, Marnie, at 8:00 p.m. on August 14, 1977. She left him locked inside their grocery store-gas station, where he had been spending the night because of recent robberies and burglaries in that area. Carnley had, on his person, a wallet which contained approximately $2,000, a roll of money totalling $1,500, and a pistol.
The next morning, at approximately 6:00 a.m., a customer found Carnley's body inside the store where Carnley had been murdered with a .22 caliber, pearl-handled pistol, which had been left beside the body. Carnley had been shot three times in the back of the head and five more times in the face. He was pronounced dead at the scene.
A police investigation immediately following the discovery of Carnley's body revealed that Carnley's wallet and its contents had been taken, but the money roll and the pistol in his front pocket had not. Several other amounts of money, which, including the roll in Carnley's front pocket, totalled $4,500, were found inside the store where they had been deposited or hidden by the Carnleys.
The murder weapon was a gun that Carnley kept in a cashdrawer underneath the cash register counter. Carnley's body was discovered in front of the counter. In addition to the murder weapon and the pistol in Carnley's front pocket, a third pistol was found, undisturbed, underneath the counter where it was kept.
There was no evidence of a struggle prior to the shooting.
Dr. Richard Roper testified that, although the cause of death was massive bleeding resulting from the multiple head wounds, any one of the three wounds to the back of the head could have been fatal.
The critical issue at trial was the identification of the appellant. Police technicians found no physical evidence at the scene to connect the appellant with this crime. Although there was evidence that the appellant was being investigated in connection with other crimes that had taken place in Covington County at about the same time (and that she was being prosecuted in at least one case), the record does not reveal the specific evidence or information that led to her investigation for this offense. Sheriff Eli Harrell testified that the appellant had been arrested in Coffee County on charges unrelated to this case and had been transferred to Covington County via a prisoner exchange. She was detained in the Covington County jail on these unrelated charges, the nature of which Sheriff Harrell could not recall at trial, from November 4, 1977, until she confessed to and was charged with Carnley's murder. Sheriff Harrell could not remember the exact number of times that the appellant was questioned about Carnley's murder before she confessed, but he estimated that he questioned her on six occasions. He verified that before questioning, and, specifically, before she gave her oral and written confessions on January 19, 1978, and January 23, 1978, respectively, he carefully read and explained to the appellant her Miranda rights. He stated that she indicated that she understood those rights and signed the appropriate waiver forms. He also testified that no one, in his presence or to his knowledge, offered the appellant any reward or hope of reward or threatened her to induce her statements. Several other officers confirmed the fact that the appellant's statements were taken in compliance with Miranda.
*819 The oral statement given on January 19, was essentially the same as the written statement given on January 23, 1978, which read as follows
"Statement of Debra Bracewell, W/Female, DOB: 4-17-60. Date 23 January 1978, 3:15 p.m. After being read her rights and signing a waiver of those rights, the following statement was given by Debra Bracewell in the presence of Alabama Investigator, Marlon Brewer and Deputy Sheriff, Linda Cassady: `Charles and I left granny's about 10:30 on Sunday night, 14 August 1977. We went to Eddie Robinson's house near Samson. Eddie was there, his wife and children, Buddy Moore and his wife, Mabel was there too. We stayed about 1 and ½ hours. We left there and went to Charles' sister, Maydean, in the apartments in Samson. No one answered the door. We sat in the yard and talked a few minutes. We talked about trying to find someone to rob in Samson. We couldn't think of anyone. We went down to the river and stayed there a little while. We left and started to Elba, going through Opp. We started up Highway 84 going to Elba. We passed Rex Carnley's store and Charles started turning around. I asked him why. He went on past the store and parked and then he told me that he wanted us to go in there and rob Rex Carnley. He wanted me to go behind the counter on the right side and get a gun out of the drawer and shoot Rex. We turned around and came back to the store. Charles got out his gun and put it in his belt. We went to the door and Rex said, "Charles, come on in." We went in. I went behind the counter like Charles told me to and got the gun. Charles was holding a gun on Rex. Rex told him to quit playing games and Charles said he was not playing a gamehe wanted the money. I was, D.B., sitting down on top of the stool and then I stood up on the rungs and shot Rex in the back of the head (At this point, Debra showed that she held the gun approximately 18" from the back of Rex's head and shot him in the back of the head). Then Charles took the gun. I ran out and he was shooting Rex. Then Charles came out with a billfold in his hand and his gun. He got in the car and we went to granny's and Charles told me I had some blood on my dress and I changed clothes. Charles changed clothes too. After we changed clothes, I went to the kitchen while Charles counted the money. He said it was $1,200.00. He didn't give me any of the money. We left and went to the River near Samson. Charles parked the car before we got under the trestle. He got out and walked toward the woods with the billfold in his hand. He was gone about 5-10 minutes. I stayed in the car. I asked where was the billfold and he said it was gonenot to worry about it. We left and went to Charles' sister's house in Samson. We saw her just before she went to work. Then we went to the sewing factory and filled out work applications. Charles saw his sister again at the factory and borrowed $2.00. I asked him why he borrowed the money and he said to make her think we didn't have any money. We left there and went back to Eddie Robinson's. Eddie's kids were there and Mabel and Ondas Paul. We waited there until Eddie and Inez came in from work. Charles told Eddie that he had to get out of the State because the law would be looking for him for killing Rex Carnley. We left that night for Florida.' The above is a true and correct statement that I have given on my own free will without threats or promise. Signed, Debra Bracewell."
This statement was consistent with the scene of the crime, the time of discovery of the body, the nature of the wounds inflicted, the normal hiding place of the murder weapon, and the fact that the only property taken was Carnley's wallet and its contents. A subsequent search of the area where the appellant said her husband had changed his clothes and had discovered the stolen wallet was unsuccessful.
In defense, the appellant vigorously challenged the voluntariness of her confession. *820 She testified that on November 4, 1977, she was arrested at her home by the Covington County officials and that they did not explain the charges against her. She testified that she was repeatedly interrogated, in excess of fifteen times, by a number of different officials and that she eventually confessed only to make them leave her alone.
Evidence was introduced that the appellant was of inferior intelligence and that her education, only through part of the seventh grade, was primarily in a special education curriculum.
The appellant presented one alibi witness, who testified that, on the morning of August 15, 1977, at about 7:00 a.m., the appellant filled out, in his presence, an application for employment at the factory where he worked.
The evidence, including appellant's inculpatory statements, was put to the jury, which found the appellant guilty as charged. In the sentencing phase hearings which followed, the trial court agreed with the jury that the mitigating circumstances outweighed the only aggravating circumstance, a murder during the commission of a robbery, and, consequently, sentenced the appellant to life without parole.
On the authority of Coulter v. State, 438 So.2d 336 (Ala.Cr.App.1982), and cases cited therein, we find that appellant's constitutional challenge of the Alabama Supreme Court's holdings in Beck v. State, 396 So.2d 645 (Ala.1981), is without merit.
An exclusionary rule in effect when the instant offense was committed provided that a voluntary confession made by a "child" was inadmissible "unless advised by counsel." Ala.Code § 12-15-67 (1975). The definition of "child" in § 12-15-1(3), Code of Alabama (1975), states, in pertinent part, that:
"a. Such term, before January 1, 1978, means an individual under the age of 17 ....
"b. Such term, after December 31, 1977, means an individual under the age of 18 ...."
The appellant contends that this two-part definition of "child" in § 12-15-1(3) violates the equal protection clause of the Fourteenth Amendment (U.S. Const. amend. XIV).
She contends, generally, that § 12-15-1(3) invidiously discriminated against those persons who were 17 years old between January 16, 1977 (the effective date of the statute) and January 1, 1978, the date when the definition of child included 17 year olds.
We need not reach the merits of this constitutional question because it was not preserved in the trial court, but rather was raised for the first time on appeal. Steele v. State, 289 Ala. 186, 266 So.2d 746 (1972); Barclay v. State, 368 So.2d 579 (Ala.Cr. App.), cert. denied, 368 So.2d 581 (Ala. 1979); Moore v. State, 415 So.2d 1210 (Ala. Cr.App.1982).
The appellant further contends that the trial court erred in denying her "Motion for Change of Venue." Although grounds are set out in appellant's Motion, no argument is made on appeal in support of this contention. Nevertheless, we have reviewed the grounds set out in appellant's Motion and the evidence presented at trial in support thereof, and have concluded that the trial court did not err in denying the motion for a change of venue.
The newspaper articles presented in support of appellant's motion were factual and objective and did not appeal for mob action or attempt to incite passion or prejudice against this appellant. Mathis v. State, 52 Ala.App. 668, 296 So.2d 755 (1973), cert. denied, 292 Ala. 732, 296 So.2d 764 (1974); McLaren v. State, 353 So.2d 24 (Ala.Cr. App.), cert. denied, 353 So.2d 35 (Ala.1977); Robinson v. State, 430 So.2d 883 (Ala.Cr. App.1983). As is generally the case with venue questions on appeal, we defer to the sound discretion of the trial court, there being no "clear or gross abuse of discretion" on its part. Burnett v. State, 350 So.2d 718 (Ala.Cr.App.1977); Robinson v. State, supra, and numerous cases cited therein.
*821 In conjunction with her contention concerning the change of venue motion, the appellant asserts that the trial court erred in refusing her voir dire questions, nos. 7-16, 20-24, 26 and 27, requested as inquiries for qualifying the jury venire.
In selecting a jury for a particular case, "the nature, variety, and extent of the questions that should be asked prospective jurors" must be left largely within the sound discretion of the trial court. Peoples v. State, 375 So.2d 561 (Ala.Cr.App.1979). In other words, the scope of the voir dire examination of the jury venire is within the broad discretion of the trial court. Bowens v. State, 54 Ala.App. 491, 309 So.2d 844 (1974), cert. denied, 293 Ala. 746, 309 So.2d 850 (1975); Witherspoon v. State, 356 So.2d 743 (Ala.Cr.App.1978); Ervin v. State, 399 So.2d 894 (Ala.Cr.App.), cert. denied, 399 So.2d 899 (Ala.1981). It is highly proper for the trial court to conduct the voir dire examination. Witherspoon v. State, supra, and cases cited therein. When the trial court's examination is thorough and extensive, its refusal of every question requested by defense counsel might be proper. Holmes v. State, 342 So.2d 28 (Ala.Cr.App.), cert. denied, 342 So.2d 36 (Ala.1977); Ervin v. State, supra.
We have carefully examined each refused question and the trial court's extensive voir dire examination. The majority of the questions requested by the appellant were in the nature of jury instructions as to legal principles applicable to the case. These and the other requested inquiries were properly refused in this instance in light of the trial court's extensive examination of the jury venire and the trial court's thorough oral charge to the jury at the close of the evidence. There was no error.
The appellant made an oral confession on January 19, 1978, and a written confession on January 23, 1978 (as noted above). These confessions were essentially identical. Both were introduced as evidence for the jury's consideration. Before either statement was introduced, however, pursuant to appellant's motions to suppress, voir dire hearings were held outside the presence of the jury, so that the trial court could determine whether or not each statement was admissible as "voluntarily and knowingly" made.
Appellant's argument is that the trial court did not properly apply the "totality of the circumstances" standard [See, Garrett v. State, 369 So.2d 833 (Ala.1979), reversing, 369 So.2d 827 (Ala.Cr.App.1978); and cases cited therein], and, therefore, erred in determining that her confessions were voluntarily, knowingly, and intelligently given. We disagree.
During the suppression hearing for the oral statement, the appellant testified that she was taken into custody by Sheriff Harrell late at night on November 4, 1977, and taken from her home to the Covington County Jail. She testified that she was questioned about Carnley's murder that night and no less than fifteen times in all from November 4 until she confessed on January 19, 1978. She stated that she was interrogated by a number of people at different times and sometimes was questioned more than once on the same day. She eventually confessed "to make them leave [her] alone," but only after they started making up stories about how the murder was committed. She did admit, however, that on several occasions Sheriff Harrell had told her that she had a right to an attorney, and that her interrogators never made any promises to her. The appellant was seventeen years old when she confessed to this murder, and had a seventh grade education, the latter part of which was completed in a "special education" curriculum. The appellant offered no other evidence during the suppression hearing.
Sheriff Harrell testified that he was not present when the appellant was taken into custody, but that she was arrested on unrelated charges in Coffee County and transported by Coffee County authorities through a prisoner exchange to the Covington County Jail early in the evening on November 4, 1977. He read and explained to the appellant her Miranda rights before questioning her on November 4, and again several times thereafter. He testified that *822 the appellant was not abused, threatened or promised any reward for her confession. He specifically repeated the Miranda warnings on January 19, 1978, just before the appellant confessed to Carnley's murder, and the appellant said that she understood them. Although she was offered one several times, she never requested an attorney. In Sheriff Harrell's opinion, the appellant's oral statement was voluntarily made.
On cross-examination Sheriff Harrell stated that the appellant was not prompted in any way, and was not asked leading or suggestive questions. He knew that she was seventeen years old at the time. The conversation during which she confessed was initiated by the appellant, after she had failed a polygraph examination. Sheriff Harrell had questioned her about five or six times prior to the date of her confession.
Based on this voir dire testimony, the trial court ruled that the appellant's oral confession was voluntarily and intelligently made and was, therefore, admissible.
The trial court accepted the voir dire testimony from the hearing on the motion to suppress the oral confession as evidence on the motion to suppress the written statement made on January 23, 1978. In addition, Marlon Brewer, an investigator for the Alabama Bureau of Investigations, testified that, before her written statement was transcribed, the appellant was advised of her Miranda rights, and that she responded that she understood them. He stated that she was not threatened or abused and was not offered any reward or hope of reward as an inducement for her confession. After the statement was transcribed, the appellant read it and verified that it was the truth.
On cross-examination, Brewer stated that he knew the appellant was seventeen years old when the written confession was taken, but that he had no idea that she was a former "special education" student or that she "was of low mentality." He stated that she seemed to handle herself well during his interrogations and never gave any indication that she had a low intellect.
Barbara Blackwell, an employee with the Covington County Sheriff's Office, transcribed the appellant's written confession on January 23, 1978. She witnessed the appellant sign the written statement. Blackwell explained the statement to the appellant, who read it, indicated that she understood it, and voluntarily signed it.
The appellant further testified that she signed the statement "because they wouldn't leave me alone." She stated that she never asked for an attorney because she did not know she could have one. She stated that she read and signed the statement but did not understand all of it.
There was evidence that prior to her incarceration on November 4, 1977, the appellant had been arrested for another offense unrelated to Carnley's murder. She had been appointed an attorney, who represented her in this unrelated matter, which was, apparently, resolved in December, 1977. During the period between November 4, 1977, and her confessions in January, 1978, although she was often advised of her right to contact an attorney to represent her in connection with the Carnley murder investigation, she never contacted or asked anyone else to contact this previously appointed attorney or any other attorney.
Based on all the voir dire testimony from both suppression hearings, the trial court admitted into evidence the appellant's written confession.
The thrust of appellant's argument is that, although she occasionally indicated to the contrary, she never totally understood her right to an attorney, the ramifications of answering questions relating to Carnley's murder, or the entire written confession that she signed. She argues on appeal that the evidence supports her contention that she lacked the intelligence to fully comprehend what was happening.
As noted above, there was ample evidence presented on voir dire (including appellant's own testimony) for the trial court *823 to make a voluntariness determination. In light of appellant's evidence to the contrary, the trial court determined that her confessions were voluntarily and knowingly made. Such a determination, supported, as here, by the evidence, was within the sound discretion of the trial court. Elrod v. State, 281 Ala. 331, 202 So.2d 539 (1967); Jackson v. State, 375 So.2d 1271 (Ala.Cr. App.), cert. denied, 375 So.2d 1274 (Ala. 1979), and cases therein cited; Hobbs v. State, 401 So.2d 276 (Ala.Cr.App.1981); Moore v. State, 415 So.2d 1210 (Ala.Cr. App.1982), and cases therein cited.
Additional evidence on the voluntariness issue, presented after the confessions had been properly admitted by the trial court, went to the jury for their consideration of the weight and credibility of appellant's statements. Elrod v. State, supra; Hobbs v. State, supra, and cases therein cited. Such additional evidence had no effect upon the trial court's voluntariness determination.
Appellant insists, in the alternative, that her oral and written confessions were inadmissible as evidence because they were the "fruits" of an illegal arrest. The appellant made several attempts to introduce evidence to show that, when the two confessions were made, she was being detained, illegally, in the Covington County Jail, under no warrant of arrest, and that she had been thus incarcerated since November 4, 1977. She stated, on voir dire examination, that on November 4 she was escorted by Sheriff Harrell from her home to the Covington County Jail, where she remained until she confessed to the Carnley murder.
Sheriff Eli Harrell testified, to the contrary, that the appellant had been arrested on charges unrelated to the instant offense, but that he could not recall what those charges were. He stated that the appellant had been arrested in Coffee County by Coffee County officials and had been transferred to Covington County via a prisoner exchange process. He offered to go get his records to establish the unrelated charges on which she was arrested.
The appellant argues, on appeal, that, since the prosecution never showed what these unrelated charges were, it did not prove that she was under lawful arrest. Consequently, the appellant contends that her confessions should have been suppressed as the "fruits" of an illegal arrest.
We need not reach the merits of this contention because this issue was not properly preserved for our review. The appellant did not object, at trial, to the admissibility of her confessions on the "fruit of an illegal arrest" ground and she did not state this as a ground in her motions to suppress or her motion for a new trial. For aught that appears, she did not invoke a ruling, and the trial court never ruled, on this issue. Because this issue was raised for the first time on appeal, it is not properly before us and will not be considered herein. See, Robinson v. State, 38 Ala.App. 315, 82 So.2d 815 (1955); Hargrove v. State, 344 So.2d 823 (Ala.Cr.App.), cert. denied, 344 So.2d 826 (Ala.1977); Waters v. State, 360 So.2d 358 (Ala.Cr.App.), cert. denied, 360 So.2d 367 (Ala.1978); Cook v. State, 384 So.2d 1158 (Ala.Cr.App.), cert. denied, 384 So.2d 1161 (Ala.1980).
We must note, however, that Sheriff Harrell testified that the appellant was under lawful detention, and that the argument to the contrary is based solely on speculation from Sheriff Harrell's inability to recall the specific charges against her.
The only evidence introduced at trial that directly connected the appellant with the murder of Rex Carnley was the appellant's oral and written confessions. Consequently, the appellant focused her efforts at trial on convincing the jury that her confessions were erroneous. Evidence that the appellant had an I.Q. of 62, that she was in the educatable mentally retarded range, and that she had only a seventh or eighth grade education, the last part of which was completed in "special education" courses, was presented to support appellant's theory that she lacked the intelligence to understand the nature and consequences of her confession and that her confessions were not her statements, but rather "stories" of *824 her involvement in the murder suggested to her by her interrogators, which she eventually confirmed so that they would stop bothering her. Although a significant amount of evidence was admitted on this issue of the weight and credibility of her confessions, the appellant argues that other relevant and material evidence was erroneously excluded from the jury by the trial court's sustention of several objections by the prosecution.
John Sharpless, a guidance counselor at Elba High School, testified, at length, with reference to certain intelligence tests that he administered to the appellant in October 1975, a year and a half before she "dropped out" of school on March 25, 1977. He answered numerous questions concerning the details of a test which indicated that the appellant had an average I.Q. of 62. He stated that the appellant was educatable and within the range required for special education classes. He answered questions from individual jurors and a copy of his test results was admitted into evidence.
Sharpless also testified that he noticed that the appellant had a speech impediment. His recommendation, based on the test results, was that the appellant be placed in the Educatable Mentally Retarded (EMR) class. His entire psychological report was marked as an exhibit for the jury.
Sharpless also reported the last grades he had on record for the appellant. These grades for the fourth grading period (Spring, 1977) in the ninth grade special education curriculum were as follows: Language Arts90; Home Ec. 90; Math71; Occupations80; Home Ec.88; and P.E. 70. He stated that these were based on a scale of 100 with 90-100 representing an A. He explained, however, that these grades were not comparable to similar scores in the "regular" curriculum.
The appellant complains that the trial court erred in sustaining the State's objections to questions calling for Sharpless' general conclusions about her personality, the validity of her confession, and her susceptibility to being "led" without comprehending what she was being led to do.
Because the State's objections to these questions were not specific and the trial court did not explain its rulings, it is not clear, on appeal, upon what ground or grounds these objections were sustained. Nevertheless, we are convinced that the trial court's actions do not constitute reversible error.
The appellant argues that Sharpless had been qualified as an expert and, because he had explained his association with the appellant and the results of her intelligence tests, he should have been allowed to answer these questions pertaining to the credibility of appellant's confession.
All three questions, noted above, called for opinions or conclusions from Sharpless, an experienced guidance counselor. Whether or not Sharpless was qualified to state his opinion, in each instance, was a matter within the sound discretion of the trial court, whose rulings will not be disturbed absent a clear abuse of that discretion. Carmichael v. State, 48 Ala.App. 748, 267 So.2d 538 (1972); Carroll v. State, 370 So.2d 749, 760 (Ala.Cr.App.), cert. denied, 370 So.2d 761 (Ala.1979); Jolly v. State, 395 So.2d 1135, 1143 (Ala.Cr.App. 1981). There is no clear abuse in this case.
Sharpless was asked to give his opinion about the appellant's personality before any predicate was established. The trial court correctly sustained the State's objection and the question was not asked again.
The other two questions solicited, in different words, Sharpless' opinion of the credibility of appellant's confession. The appellant insists that Sharpless was qualified, as an expert, to offer such conclusions. "The criterion for admission of expert testimony is that the witness, by study, practice, experience or observation as to the particular subject, has acquired a knowledge beyond that of an ordinary witness." Meade v. State, 390 So.2d 685 (Ala. Cr.App.), cert. denied, 390 So.2d 693 (Ala. 1980), and cases cited therein. White v. *825 State, 294 Ala. 265, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). "Where there are questions which inexperienced jurors are not likely to decide correctly, there is a necessity to admit opinions and conclusions of those specially skilled or experienced in the particular field; that is, experts who can give better opinions on a given state of facts." White v. State, supra. But even experts are not allowed to state conclusions that invade the province of the jury, conclusions based upon conflicting testimony that could be understood and resolved by the jury. See White v. State, supra; Flint v. State, 370 So.2d 332 (Ala.Cr.App.1979).
For aught that appears in the record, the conclusions solicited from Sharpless would have been based upon his intelligence testing of appellant, the results of which were already before the jury. Sharpless was undoubtedly qualified to interpret his test results and arguably qualified to comment, generally, upon the validity of a confession by this appellant. However, the trial court would have been correct in determining that the credibility of appellant's confession was a question for the jury, which could adequately make a determination without Sharpless', arguably, competent opinion. In other words, the jury was competent to determine the weight and credibility of appellant's confession in light of the facts and reports supplied by Sharpless. Sharpless' opinions on the subject were not necessary and their exclusions from the jury were not harmful to the appellant. A.R.A.P. 45.
The appellant attempted to introduce her school records from Fleeta Junior High School where she was participating in a special education curriculum through part of the seventh grade. The State objected and the trial court sustained the objection. The appellant claims that the trial court's action was error.
There was no prejudice to the appellant in refusing these Fleeta records. A.R.A.P. 45. Apparently, the Fleeta records covered the appellant's education from the second grade through part of the seventh grade in late 1974 or early 1975. Consequently, the latest of these records was for appellant's educational history three years before her confessions were made. Even if there had been information in these records that might have been otherwise admissible (the appellant did not make any showing of what the records contained), it was, arguably, too remote to be relevant. See, Gullatt v. State, 409 So.2d 466, 473 (Ala.Cr. App.1982). The appellant, apparently, intended to use the Fleeta School records to bolster other proof that she was an unintelligent person. Ample evidence of her low intellect, including the intelligence testing done in October 1975 and her Elba High School records through the Spring, 1977, was already before the jury.
The appellant further cites, as reversible error; the trial court's sustention of the State's objections to several questions propounded to Dr. Kenneth Warren. She argues, generally, on appeal that Dr. Warren, a professional clinical pyschologist, should have been permitted to answer all of her questions. We have carefully reviewed each question and have determined that the objections to each were properly sustained.
Dr. Warren was properly qualified as an expert witness. He testified that he performed thorough psychological examinations of the appellant in 1978, just after she entered the Alabama prison system, and again in 1981, the week before the instant trial. Without discussing the nature of the tests that he administered to the appellant or the specific results thereof, he was asked a series of questions that appeared to solicit his opinion as to the voluntariness and credibility of appellant's confessions. In general, these questions were material only in reference to the weight and credibility of the confessions, an issue still requiring a jury determination.
Initially, Dr. Warren was asked, and the State and trial court responded, as follows
"Q. [By defense attorney] And can you tell us what, if anything, your findings as to her intellectual functions and *826 what did they indicate with respect to every day life?
"MR. LANIER: Your Honor, I'm going to have to object to
"THE COURT: I would sustain the objection.
"MR. JONES: And we except.
"Q. Did your examination and testing of Debra give you any indication of her personality?
"MR. LANIER: Your Honor, I am also going to have to object to that question.
"THE COURT: Sustain the objection.
"MR. JONES: Except."
Because no grounds were stated with the State's objections there was no indication of the basis for the trial court's sustention of these objections. There are at least two grounds, however, which justify the trial court's rulings. As propounded, these questions were confusing, indefinite and vague, and failed to disclose to the trial court the materiality of the expected evidence. See, Goodson v. State, 29 Ala.App. 389, 197 So. 69 (1940); Scott v. State, 45 Ala.App. 149, 227 So.2d 436 (1969); Jones v. State, 52 Ala.App. 184, 290 So.2d 251 (1974); Raley v. State, 351 So.2d 642 (Ala. Cr.App.), cert. denied, 351 So.2d 646 (Ala. 1977). Furthermore, "if the expert bases his opinion on his personal knowledge, he must first testify to the facts within his own knowledge upon which the opinion is based." White v. State, 294 Ala. 265, 314 So.2d 857 (1975); see also, Colvin v. State, 32 Ala.App. 142, 144, 22 So.2d 544 (expert should first state the facts, then his opinion or conclusions), reversed on other grounds, 247 Ala. 55, 22 So.2d 548 (1945).
Rather than asking more specific questions to establish the materiality of the expected evidence or to establish the facts upon which Dr. Warren would subsequently base his opinions and conclusions, the appellant propounded to Dr. Warren a series of hypothetical questions soliciting similar opinions as to the voluntariness of her confessions. These questions were also followed by objections sustained by the trial court. "In general, the proper form of a hypothetical question asked of an expert, when [allegedly] based on evidence in the case, rests largely on the sound discretion of the trial court, and that court will not be put in error unless the discretion is abused." White v. State, supra. The trial court's actions in this instance were not improper because these hypothetical questions were arguably vague and confusing (cases herein cited) or were based on facts that were not supported by the evidence before the jury. White v. State, supra.
The appellant presented evidence to support the theory that the cause of death and the condition of the body were inconsistent with her confession. This evidence went to the jury for its consideration in determining the weight and credibility of her confession. Dr. Walker Sorrell, a forensic and medical pathologist, was thoroughly questioned by the appellant. He had not examined the victim's body, but he had read and studied the reports of Dr. Richard Roper and Mr. Richard Carter, both of whom were directly involved in the instant investigation. In effect, he testified that each wound to the back of the victim's head could have caused immediate death, which would have stopped the victim's heart, that the wounds to the back of the head would not have caused a great loss of blood, that one of the facial wounds severed an artery, and that a gun fired within three feet of its target will leave powder burns on the target. Apparently, the appellant theorized that the great loss of blood from the victim indicated that he was shot first in the face and that an absence of powder burns on the back of the victim's head indicated that the shots to the back of the head were fired from a distance of more than three feet. The appellant's confession, to the contrary, stated that she fired first to the back of the victim's head from a distance of approximately eighteen inches.
The appellant argues on appeal that the effect of Dr. Sorrell's testimony was clouded by the trial court's actions in sustaining State objections to certain hypothetical questions. We have reviewed these questions *827 and the trial court's actions and have found no errors prejudicial to the appellant. For aught that appears, Dr. Sorrell was thoroughly examined after the hypothetical questions were refused and the evidence solicited by the hypothetical questions was admitted through answers to subsequent questions, which were not objectionable to the State or the trial court. Any error in this instance was harmless. A.R.A.P. 45.
Finally, the appellant contends that the trial court erred in refusing to charge the jury on the lesser included offenses.
To the contrary, a lesser included offense instruction may be properly refused where, as here, there is no evidence to support the lesser offense. Coulter v. State, 438 So.2d 336 (Ala.Cr.App.1982); and cases therein cited.
In summary, we have carefully reviewed the issues presented on appeal and have determined that there were no errors prejudicial to this appellant. Of critical concern was the voluntariness of appellant's confessions. The trial court held hearings outside the presence of the jury and, in light of appellant's testimony to the contrary, determined that her confessions were admissible. Even though the appellant was only seventeen years old and was not very intelligent, the evidence presented during the voluntariness hearings was sufficient to support the trial court's rulings thereon. Additional evidence was presented to the jury to discredit these confessions. The jury's determination, in light of this additional evidence, that the appellant was guilty as charged was supported by the evidence. The appellant's age, intelligence, and background were obviously factors which the jury and the trial court considered in recommending that the death penalty not be imposed and that the appellant be sentenced, instead, to life without parole.
We have carefully searched the record for errors injuriously affecting the substantial rights of the appellant and have found none. The judgment of conviction, and sentence rendered thereon, is due to be affirmed.
AFFIRMED.
All the Judges concur, except TYSON, J., who dissents with an opinion.
TYSON, Judge, dissenting.
For the reasons stated in my dissent on the original appeal of this cause, Bracewell v. State, 401 So.2d 126-129 (Ala.Cr.App.), rev'd, 401 So.2d 123 (Ala.1979), on remand, 401 So.2d 124 (Ala.Cr.App.), cert. denied, 401 So.2d 130 (Ala.), vacated, 449 U.S. 915, 101 S.Ct. 312, 66 L.Ed.2d 143 (1980), after remandment, 401 So.2d 130 (Ala.Cr.App.), cert. denied, 401 So.2d 130 (Ala.1981), I most respectfully dissent from the majority opinion in this cause.